FILED
2022 JAN 31 PM 2:15
CLERK
U.S. DISTRICT COURT

Received
2022 JAN 28 AM 10:02
CLERK
U.S. DISTRICT COURT

**Ana Maria Ravines de Schur**
**3848 S West Temple**
**P.O. Box 50**
**Salt Lake City**
**UT, 84115-1289**
**Cell: 916-801-4756**
amravinworks@gmail.com

Case: 2:22−cv−00054
Assigned To : Romero, Cecilia M.
Assign. Date : 1/28/2022
Description: Ravines de Schur v. Dahlqvist

**To the Clerk of the United States District Court for the District of Utah**

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **Ana Maria Ravines de Schur** | **COMPLAINT AGAINST CRIME BY A DIPLOMAT IN THE STATE OF UTAH** |
| **Plaintiff,** | |
| **vs.** | **COURT CASE NO.:** |
| | _____ |
| **Attorney Charles Dahlqvist, Honorary Consulate of Germany** | |
| **Salt Lake City, UT** | **JUDGE:** |
| **Defendant,** | |
| | _____ |
| | **[DEMAND FOR JURY TRIAL]** |

Plaintiff was threatened with death by the Honorary Consul of Germany in Salt Lake City Utah

on the same day he relinquished to support Plaintiff's rights to child support and alimony to

which Plaintiff was entitled according to German law. The U.S. District Court may decide to escalate this complaint to Supreme Court level, based on 22 U.S. Code § 4304b - Crimes committed by diplomats.  This case does not fall under Status of Limitations, based on the fact that the German Consul argued "not as a Consul, not as a Lawyer, but as a Bishop of the LDS Church." The LDS Church was at the moment of the violation quite similar in practices and ideologies to those of the Crimes of Apartheid, on which the Status of Limitations falls off.

### **NAME AND ADDRESS OF THE PLAINTIFF AND THE DEFENDANT**

**Plaintiff:**

Ana Maria Ravines de Schur

3848 S. West Temple, P.O. Box 50

Salt Lake City, UT 84115

**Defendant:**

Charles Dahlqvist, Attorney and Former Honorary Consul of Germany in the State of Utah

Work Address:

KIRTON MCCONKIE BUILDING

50 E S Temple St #400

Salt Lake City, UT 84111

### **JURISDICTION AND REASON WHY THIS CASE IS FILED IN THE FEDERAL COURT**

**( 28 U.S.C. § 1131 and 28 U.S.C. and  § 1332  )**

The Plaintiff and Defendants are citizens of different states and countries, and the amount in controversy exceeds the sum of $ 75,000.00

**DIVERSITY OF CITIZENSHIP**

**U. S. CONSTITUTION - Article 3**

**Article 3**

Section 1.

The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

Section 2.

**The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;--to all cases affecting ambassadors, other public ministers and consuls;--to all cases of admiralty and maritime jurisdiction;--to controversies to which the United States shall be a party;--to controversies between two or more states;--between a state and citizens of another state;--between citizens of different states;--between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.**

**In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party, the Supreme Court shall have original jurisdiction.** In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make.

The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the Congress may by law have directed.

1. **Plaintiff calls upon the court to enforce 22 U.S. Code § 4304b - Crimes committed by diplomats.Plaintiff calls upon the court to enforce** 18 U.S. Code § **16 - Crime of violence** defined – " he term "crime of violence" means—(a)an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b)any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

2. **Plaintiff calls upon the court to enforce 15 U.S. Code § 1692d - Harassment or abuse**

3. **Plaintiff calls upon the court to enforce 18 U.S. Code § 873 - Blackmail**

   18 U.S. Code § 241 - Conspiracy against rights.

4.  Plaintiff calls upon the court to enforce **Amendment I U.S. Constitution – Congress** shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

5.  Plaintiff calls upon the court to enforce **United Nations Convention on the Suppression and Punishment of the Crime of Apartheid**, Nov. 1973, New York.

6.  Although the initial violation occurred in 1999, the consequences continue to affect the family of refugees from Germany in the United States.  Plaintiff calls upon the court to enforce **Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity** Adopted and opened for signature, ratification and accession by United Nations General Assembly resolution 2391 (XXIII) of 26 November 1968. Entry into force: 11 November 1970 that has agreed as follows:

    **Article I**

    No statutory limitation shall apply to the following crimes, irrespective of the date of their commission:

    ( a ) War crimes as they are defined in the Charter of the International Military Tribunal, Nürnberg, of 8 August 1945 and confirmed by resolutions 3 (I) of 13 February 1946 and 95 (I) of 11 December 1946 of the General Assembly of the United Nations, particularly the "grave breaches" enumerated in the Geneva Conventions of 12 August 1949 for the protection of war victims;

( b ) Crimes against humanity whether committed in time of war or in time of peace as they are defined in the Charter of the International Military Tribunal, Nürnberg, of 8 August 1945 and confirmed by resolutions 3 (I) of 13 February 1946 and 95 (I) of 11 December 1946 of the General Assembly of the United Nations, eviction by armed attack or occupation and inhuman acts resulting from the policy of apartheid , and the crime of genocide as defined in the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, even if such acts do not constitute a violation of the domestic law of the country in which they were committed.

**COMPLAINT AND DEMAND FOR TRIAL - PLAINTIFF'S ALLEGATIONS**

1. Plaintiff is a German Citizen of color who obtained Political Asylum for herself and her family of three sons (all three sons are German citizens, born 1983, 1988 and 1990 in Berlin Germany.) Their political asylum was granted in the United States in 2002, by Immigration Judge Theresa Holmes Simmons in the Manhattan Court of the State of New York.

2. Plaintiff was forced to escape violence in Berlin Germany, as she was married for fifteen years to a tenured government official works for the German Federal Government. Her ex husband defrauded their marriage by bearing a child in the same apartment building where he lived with Plaintiff and the three legitimate children. After the illegitimate child was born with Dawn Syndrome, the ex husband attempted to turn the local German authorities against plaintiff, who is a German citizen. Systemic violence affected the family of Plaintiff.

3. Plaintiff escaped with her children to the United States and first applied for political asylum in the State of Utah, in 1999.

4. Plaintiff had received a court order of the Family Court of Berlin Germany that provides for the secure payments of child support and alimony to plaintiff and her children to Germans no matter where they abide.

5. After consulting with the United States Department of State in Berlin Germany, Plaintiff was advised to contact the German Embassy in the United States to make sure that the payments of child support and alimony would be transferred punctually and in full to the plaintiff's account in the United States.

6. At the German Consulate in San Francisco, California, German Consul Uwe Koehler kindly suggested that the Plaintiff should go to the law office of Attorney Charles Dahlqvist, who served as Honorary Consul of Germany in Salt Lake City, Utah.

7. On the day of her appointment with the German Honorary Consul to the State of Utah, the Consul reviewed the decision of the Family Court in Berlin Germany, corresponding to the family's right to child support and alimony submitted by Plaintiff. Immediately he responded that he was opting for not answering to the Plaintiff's request as an Attorney (he wasn't sought as an attorney by the Plaintiff), that he was neither going to talk to her as a Honorary Consul of Germany (Plaintiff is a German citizen and he was acting in his capacity of Consul Honorary to the German government).  The German Honorary Consul proceeded to explain that he was opting to talk to the Plaintiff as a Bishop of the LDS Church (Plaintiff was no longer wishing to remain a member of the LDS

religion and had submitted her request for her name to be removed from the records and be dissociated from the LDS Church).

8. Attorney Dahlqvist proceeded to inform Plaintiff of his long listing of accomplishments as a leader of the LDS religion. He informed the Plaintiff that he was the President of the International Primary, the President of the local Rotary Club in Utah and had been multiple times an LDS Bishop.  Attorney Dahlqvist proceeded to instruct the Plaintiff that it was in her best interest to not apply for political asylum and to not request her alimony and child support payments from Germany, or else she would "end up becoming a crusader."

9. When the Plaintiff asked her Honorary Consul for his interpretation of the word "crusader" he responded asking the Plaintiff if she would like to be there for her children in the future, or end as a crusader, "like Martin Luther King."

10. The Honorary Consul of Germany in Utah's death threat was documented by the Plaintiff in her letter to the US State Department in Berlin Germany, in a report that was faxed to U.S. Agent Felix Hernandez on that same day.

11. An additional copy of that report was sent to the Salt Lake City Utah Federal Bureau of Investigation (evidence is available and has been reported multiple times to the USDOJ and to the USCIS in the United States and in the European Union).

12. But, the Utah office of the FBI failed to investigate (Conflict Of Interests: Most FBI agents in the State of Utah's FBI Office are active members of the Mormon Church and returned LDS missionaries).

13. Immigration Judge Theresa Holmes Simmons cited the German Honorary Consul's death threat and denial of basic rights her final Decision of Political Asylum (evidence is a property of the United States Federal Government).

14. Following that encounter at the office of Honorary Consul Dahlqvist in his office at the law office of Kirton McConkey Associates in Salt Lake City (these are the lawyers who work to process LDS visas for missionaries to serve the missions in Germany, Europe and other countries).

15. Parallel to the death threat against the Plaintiff, Mr. Dahlqvist initiated a defamation campaign that led the Plaintiff's attorney Sharon Preston to quit the case of political asylum that she was representing on behalf of the Plaintiff and her children.

16. Attorney Preston, who had been paid in full for her representation as immigration lawyer for the family, was called by Mr. Frazier, a local Bishop of the LDS Church who  instructed her to "Quit the case!"

17. Attorney Preston informed Plaintiff that she would never win her case of political asylum in Utah, with all those very important LDS persons united against her. Attorney Preston counseled the Plaintiff to leave to another state and reapply for her Political Asylum.  Plaintiff had to abandon the state of Utah and move on to the State of New York, where she presented a new petition that was granted as a Landmark Case of immigration in 2002.

18. The Plaintiff had to return to Utah on several occasions from New York, as it was very complicated to find permanent employment while she held a year-to-year work authorization and was surviving without the child support and alimony that

he well earning ex husband earns in Germany and to which she and the children were entitled by law.

19. Also, in the year 2001, Plaintiff had finally found employment with a Swiss company in Manhattan, NY.  The company would have sent her and her family to training and multiple trips a year to Switzerland in international business programs.

20. Because the Plaintiff at that time only held a work authorization that was renewable from year to year, the Director of Human Resources opted for finally not hiring the Plaintiff. So she had to return to the State of Utah two weeks before 911, as she wanted her children not to miss school. She could not afford the costs of living of New York City without a solid income, and without the basic income that the German Honorary Consul had blocked.

21. The law office where Attorney Charles Dahlqvist works (Kirton McConkey Associates)  is responsible for the punctual and full payments of former Nazis who immigrated to the Genetic Program of the Mormons in the State of Utah even after 1945. Many of these Nazis immigrated as LDS members, to then deliver their daughters into FLDS polygamy when they were still minors. Evidence of one  such case is available, as the Plaintiff spent time helping women in Utah to escape Polygamy.

22. Retaliations from State of Utah officials were documented at that time and continue until this day.

23. A German immigrant who posed as a high ranking Stake President in Cottonwood Utah, named, Kerry Heinz, embarked in the public relations

campaign of spreading rumors about the mental condition of the Plaintiff, telling to third parties that they should not listen, help or employ Plaintiff Ana Maria Ravines de Schur, because she was "mentally ill."  Mr. Heinz was a business person in Utah, not a psychiatrist, not a mental health assessment specialist. His persecution of the family continued and was extended to employers, neighbors and former "friends" who had offered the family a welcoming arrival from Germany when they left their country of citizenship (evidence is included).

24. In spite of the Plaintiff's continued efforts to access the rights of her family as German citizens, these were blocked by the Utah Contractors to Human and Refugee Services supported by the Federal Government who handle human and employment affairs. The office of Norman Nakamura (Utah Department of Workforce Services, office of refugees) was informed, but failed to intervene. The family has survived numerous additional traumas because of the frugality of their resources, which was worsened by the active obstruction by the Honorary Consul of Germany in Utah.

25. Plaintiff and her children have survived twenty two years of deprivation, lack of mental health, medical and dental support; and persisting abuses that have continued to be documented to the State of Utah Contractors to Federal Human Services, but no action has been taken. On the contrary, further acts of obstruction, suppression and retaliation have persisted.

26. Family Schur members are suffering under acute PTSD conditions. Plaintiff has recently been denied refugee services though in possession of a legally binding

refugee resettlement contract signed by a state of Utah refugee resettlement agency.

27. Plaintiff was left, after her return from the European Union, after conversations with the US Department of Homeland Security in Rome Italy (the interrogation of Plaintiff in Rome is documented at the USCIS) without furniture, sleeping on the floor of two empty apartments for two years (August 2019 till July 2021).

28. Health Services in Utah have been found spreading malicious personal information against Plaintiff in public places without Plaintiff's authorization.  A social worker in one of the local health service agencies funded by Federal Support in Utah has continued to call a driver, who transported a donation of furniture given to Plaintiff in July 2021 to her apartment in Salt Lake City. The driver informed Plaintiff that the social worker working for SELECT HEALTH in Utah keeps asking the driver questions about Plaintiff's personal situation and political asylum case. The Driver, a Mexican immigrant to the United States, does not know Plaintiff at all. He responded to the Social Worker to come back with a court order if she wants to know more private information of a client for whom he transported furniture. File is available. The Grievances Departments of both Select Health and Valley Behavioral Health are silent, they are not following up with the grievance process initiated by the Plaintiff.

29. The State Refugee Resettlement Agency in Utah, named Department of Workforce Services Office of Refugees, continues to suppress basic rights against Plaintiff. Transportation vouchers were denied throughout the Pandemic after Plaintiff lost her job for lack of transportation funds.

30. The argument given by the Department of Workforce Services to case managers (documented) on why they denied Plaintiff of a UTA transportation card, so that she could have driven from Provo to Salt Lake City to respond to calls for training to employment, was that they won't help the Plaintiff to find transportation, because of her organized efforts to inform the Federal Authorities of their fraud.

31. Plaintiff returned several times to Germany to request updates and clarification to the missing child support and alimony payments. Since there is a court order, the payments were legally requested. But, the German authorities appear to have locked up the Plaintiff's file. Even in 2018, they German administration in Germany explained to Plaintiff that, because the family now lives in the United States, the alimony and child support should be requested by dint of their affiliation to the German diplomacy, because  the family members are all German citizens living legally in the United States.

32. Plaintiff is being sent by the German Embassy to talk to the Consulates in California. The consulates in California continue to tell Plaintiff that the office in charge is the German Honorary Consulate in Utah. When Plaintiff contacted the German Honorary Consulate in Utah, the secretary of the German Honorary Consul responds that her office only responds to businesses and visas, not to cases such as the Plaintiff's.

33. Crimes committed by Diplomats seems not to be a legible notion to all of the officials involved in this disastrous case of international corruption.

**RELIEF SOUGHT BY PLAINTIFF TO 22 YEARS OF PAIN AND SUFFERING AND LACK OF ALL RESOURCES THAT SHOULD HAVE FACILITATED THEIR INTEGRATION IN THE UNITED STATES AS LEGALLY BINDING REFUGEES**

- The Plaintiff and her sons have survived a very aggressive experience in the United States, under the total silence of both the U.S. human services providers that respond for the well-being of the refugees and immigrants and also by the biases that were maliciously crafted by the irrational activity of the German Honorary Consul of Germany who failed at the fulfillment of the promise that the United States gave her when she was granted political asylum, Life, Liberty and the Pursuit of Happiness.

- Plaintiff demands that a new calculation be made accordingly, and full child support and alimony payments be restituted to her family, with appropriate reparations and additions according to the current status of the law in Germany for children and ex wives of German tenured government officials.

- Plaintiff demands that the United States Court please intervene in the current abuses that Plaintiff continues to suffer with her family in the State of Utah, to which the system appears to be constituted mainly by member of the Mormon church, and for reasons of interests shared, they prove themselves incapable of admitting that the violations are real and affecting a family that shouldn't be suffering these acts or vengeance by locals in the State of Utah.

- Plaintiff requests to have this case authorized for being filed In Forma Pauperis.

- Plaintiff demands that a secure health and dental insurance be provided for her family, which was omitted from their experience when the Honorary Consul of

Germany in Utah locked them out of normal health services that they otherwise would have even been able to provide with their well deserved German child support and alimony.

- Plaintiff demands that an investigation by the Federal District Court be initiated, as it is non typical for any Consul of a foreign government to extend death threats against their own citizens, let alone a diplomat working for the German Government, where damages against ethnic minorities have been handled quite carefully since 1945, because of the uncountable numbers of deaths caused by the Nazis.

- The death threat and alienation of economic rights by the German Honorary Consul in Utah was followed by numerous acts of hostility by State of Utah members of the religion that the Consul ascribed to and tried to impose upon the Plaintiff.

- Plaintiff did not meet the Honorary Consul of Germany seeking to talk to a Bishop of the LDS Church, but she attended that meeting hoping to obtain her child support and alimony rights.

- Plaintiff did not ask the Consul of Germany to be involved in her case of Political Asylum. She specified that she went to that office seeking her Child Support and Alimony as assigned by a German Family Court in Berlin, Germany.

- Plaintiff is being ostracized and denied basic rights in the state of Utah, as the whole system in the state of Utah is regulated by members "in good standing" of the Mormon religion.

- Most of the lawyers, mental health counselors and social workers who serve as providers in the State of Utah are graduates of Brigham Young University, also known as BYU.

- Brigham Young University is currently undergoing federal investigation, as it functions as a church's school that delivers all the administrators that continue to violate rights against ethnic and gender minorities in the State of Utah.

- There are no grassroots organizations in the State of Utah helping victims of institutional racism. The Mormon Church, with its long history of Mystical White Supremacy, assigns all the managers and directors who take the decisions in human services programs funded by the Federal Government.

- Plaintiff has been without an income since she lost her job at the end of 2019.

It must be taken under consideration that the Mormon religion is not an average evangelical Christian organization. This is a history of White Supremacy in which the ethnic minorities have been treated without any respect. The culture in Utah has nestled hate against skin color for reasons of the obsession of reproducing the Germanic phenotypes even through inbreeding.

### CLAIMS AGAINST THE STATE OF UTAH'S PRACTICE OF APARTHEID

The State of Utah continues to congregate its ethnic minorities in segregated wards. Whole groups of individuals belonging to particular ethnicities are made to worship in separated installations, under separated languages rather than those that dominate for

white members.  The segregated wards are usually non English speakers coming from Third World countries.

The practice is  in violation of The Declaration on the Granting of Independence to Colonial Countries and Peoples adopted by the United Nations General Assembly on 14 December 1960.

The United States is not alone in the misuse and abuse of the law that was developed to  protect all peoples equally and without biases.  But among the Mormons the racial discrimination allows for very biased obstructing methods in the distribution of equal access to Justice and to survival resources that are granted by the federal government to be distributed without discrimination.

The discriminatory activity in Utah occurs  through concealed  acts of segregation that deprive ethnic minorities from the radical promise of the United States (Life, Liberty and the Pursuit of Happiness).

In such an existing racist environment, the Plaintiff and her family continue struggling without reaching access to basic rights although they are actually under "Protected Status" as political asylees in the United States.

Plaintiff asks, when will her family be safe, if they escaped persecution in Germany, to be granted a Landmark Case of political asylum in the United States, to then be

discriminated by the Mormons in the State of Utah, after they follow a very prejudiced tradition that reflects all the attitudes and arrogant behaviorisms of White People in South Africa during the times of Apartheid?

The problem in the State of Utah is that the culture continues to develop under an unacceptable ideological brainwashing into White Supremacy by a class dominated by one group of people only. This group believes that White Supremacy deems them superior to the rights deserved by colored communities by dint of a constructed "religious" belief in that they are chosen and privileged by Divinity, because the colored people sinned before they were born. This is a religious doctrine by the Mormons that finds no support in any international agreements for the protection of the rights of Indigenous Peoples. It is also a violation of **The International Convention on the Suppression and Punishment of the Crime of Apartheid – G.A. res. 3068 (XXVIII)), 28 U.N. GAOR Supp. (No. 30) at 75, U.N. Doc. A/9030 (1974), 1015 U.N.T.S. 243, entered into force July 18, 1976.**

The Mormons are in control of all the resources in the State of Utah that arrive from the federal government to each of the individual states.  In the State of Utah these members have been indoctrinated and have become very articulate for 185+ years at teaching their followers that white people have rights, but people of color don't have the same rights, because they sinned before they were born. This is worse than any other racist society existing in the United States. The Mormons have a long historical inception of an invented divinity that mandated to  the world that people of color are here to suffer, because they sinned before they were born. This belief system must be reinterpreted in contemporary language as an act of Domestic Terrorism.

People of color in a place like the State of Utah are not granted equal rights, unless they agree to get baptized in the religion of the Mormons, a religion that contains so many elements of White Supremacy, that no person of color would volunteer to assume such a racist creed and tradition as a personal doctrine or as a sincere belief system. By supporting a men-made dogma that chastises people of color under the mandates created by a religion that claims rights to an elitist White Supremacy that for so long has religiously claimed the segregation of those who are not whites, the Mormons have claimed a fictitious identity of Sanctified Whiteness that is in violation of Federal and International Laws against the crimes of Apartheid.

A person of color who tries to survive under such a White Supremacist society and culture that exalts racists as prophets and vicious sexual offenders, pedophiles and inbreeders as holy men, a society that resorted to Germanic sex trafficking from Europe to integrate those human beings into the Genetic Program invented by the Mormons to reproduce a Master Race fast and dangerously (their invention of doctrinal endogamy affected the health of their own newborns through the damages caused by inbreeding), is not going to be able to provide the luxury of equal access to any resources for the existing ethnic minorities, because the system in a place like the State of Utah perpetuates the privilege of the ruling elite, which is Whiteness. This is why abuses and violations against the rights of ethnic minorities in the State of Utah are not followed up by any investigative process.

Although ethnic minorities may  have been discriminated and abused in numerous documentable instances of their life experiences in the state of Utah, there is the malicious complicity of the state of Utah contractors to federally funded programs that should but do not distribute the healing resources equally, so that people of color are not going to be able to live free of the impact of racism and discrimination that lies in the foundations of the United States as a country, and that has persisted in an augmented version through the religious ideology of the Mormons, who dominate a US State.

The system of racial discrimination in the State of Utah makes it difficult if not impossible for ethnic minorities that are affected by the systemic segregation carefully nestled by the founders to convict those who violate their rights as ethnic minorities. Civil Rights, human and constituent's services in the State of Utah are organized only to serve and be accountable for those who hold the power of their race, particularly after the Mormons have carefully shaped a culture that is ideologically driven to be desensitized to the abuses committed against people of color, because  the masses in White Supremacist Utah have been brainwashed to believe that people of color are guilty for sins they committed before they were born.

Plaintiff and her family are in need of an urgent intervention by the United States Supreme Court. They need trauma therapy and other medical services that are being omitted at the present time from their experience while they undergo numerous violations that will be documented in the trial.

The circumstances involving the Plaintiff's family case of immigration represent alarming acts of violence by State of Utah local contractors to the federal government; and as seen in this case, by international contractors to foreign governments. This situation is quite atypical for the respectful handling of refugees guaranteed by the U.S. Law and Constitution.

For all the reasons stated above, Plaintiff demands that Federal Investigation be initiated, and the appropriate amendments be done to the 22 years of harm that these individuals have brought up against the Plaintiff's family integration to the freedoms promised by the United States disregarding skin color and religious affiliation.

Ana Maria Ravines de Schur / Signed this on January 21, 2022

_____

Enclosures:

A.  FBI Report sent by Plaintiff to the FBI and to the United States Department of State in Berlin-Germany. This report is also in the archives of the USCIS — E.U American Embassies of five E.U. Countries.

B.  Three letters by Witness Paul Foreman in protest to the acts by the Honorary Consul of Germany and his friends.

Further evidence will be submitted.

# Certificate of Service

A copy of this electronic communication is being sent to:

**Office of U.S. Attorney Charles Dahlqvist**
Honorary Consulate of Germany in Salt Lake City, Utah
**Attn: Secretary of the German Honorary Consulate in Salt Lake City, UT:**
**ERIKA GARCIA** - Email: germanconsul@kmclaw.com

U.S. Department of Homeland Security
U.S. Department of Justice

Ana Maria Ravines de Schur. Dated: January 27, 2022